## *In re* CLEARWATER'S WILL.

### (*Surrogates' Court, New York County.* July 24, 1888.)

WILLS—CAPACITY TO MAKE—EVIDENCE.

On an issue as to testator's capacity it appeared that he was 75 years old, and feeble, when the will was made, and that shortly thereafter his memory became defective, his conversation at times incoherent, and his actions eccentric. He greatly mourned the death of his two daughters, which occurred a few years before, and at times spoke of them as though still living. By former wills he had disposed of his property differently than was done by the instrument in question, and he had also declared an intention to make a disposal different than was made; but since then deaths had occurred which would naturally alter his intention. Several witnesses testified that they observed no decay in testator's faculties until some time after execution of the instrument. *Held,* that the evidence did not establish testator's incapacity.[1]

On application for admission of John H. Clearwater's will to probate.

*Charles Whelp,* for proponent. *Sidney H. Stewart,* special guardian, for contestants.

RANSOM, Sur. The decedent was for 45 years connected with the institution for the deaf and dumb in this city, as its carpenter, and as instructor in carpentry, joinery, and cabinet-making. He was a large, active, powerful man, and died in 1887 at the age of nearly 76. The instrument offered for probate was executed on the 27th of August, 1884. By it a bequest of $600 was made to each of seven children of a deceased son and two daughters on their arriving at the age of 21, and the residue of the estate is given to his wife for life, with the remainder over to his son Edward, who is his only living issue. Objections were filed by the special guardian of five of the grandchildren, alleging a want of proper execution of the instrument; that the decedent was not of sound mind and memory; and that the execution of the instrument was procured by fraud, undue influence, and circumvention exercised by Edward Clearwater, the principal legatee and devisee. The subscribing witnesses were Mr. Whelp, the attorney who drew the instrument, and Mr. Currier, one of the teachers in the institution for the deaf and dumb. Their testimony shows that the instrument was properly executed in the house of Mr. Currier, and in the absence of Edward Clearwater; and Mr. Whelp testifies that Edward was not present when he received the instructions from the decedent for its preparation. And as the contestant has failed to maintain the allegation of fraud, undue influence, and circumvention in the procurement of the instrument, the first two allegations must be dismissed.

The mental incompetency of the decedent is sought to be sustained by proof of defective memory and a lack of coherence in conversation, which peculiarities are claimed to have exhibited themselves from a time previous to the date of the will down to his death. Mr. Crout, who married the youngest daughter of the decedent, testified that after her death, in 1882, he noticed a defect in the decedent's manner of speech; that he went from one subject to another, was forgetful and wandering, and was also a little childish; that about two years after her death (which would be a short time previous to the execution of the will) the decedent asked him what other daughter of his family he had married, and also asked him where he lived, and, on being told, asked for a pencil, which was given him, and the decedent put it away behind the chair and underneath the carpet. Mr. Crout also recollects that he asked the decedent in 1884 if he had seen Mr. Vaughan, the other son-in-law, and that he replied yes; that he had seen both Mr. Vaughan and his wife; and that this occurred within three or six months after Mrs. Vaughan had died. He also testifies to having seen the decedent on one occasion in 1884, directly

[1]On the subject of testamentary capacity, see In re Buckley's Will, *ante,* 24, and note; In re Bull, *ante,* 52, and note.

after Mrs. Vaughan's death, which occurred in January, take a handkerchief and tear it in ribbons. Mr. Vaughan, the husband of the other deceased daughter, testified that he noticed a change in the decedent's appearance after the death of Mrs. Crout; that he suffered great bereavement on account of her loss, showed a defective memory, and that this peculiarity increased in greater proportion after Mrs. Vaughan's death. He stated that two years after Mrs. Crout's death the decedent asked him to stop and see her; also that he did not appear to recollect that he (Vaughan) had more than one child, when he had three, who had visited the decedent frequently. About the same time he asked Mr. Vaughan where Hattie (Mrs. Vaughan) was, and why she did not come with him, though at this time she had been several months dead, of which the decedent was aware. Both of these events he fixes as having occurred after the decedent left the institution, and the evidence shows that his connection ceased September 1, 1884. To further support the allegation of mental incompetency it is shown that, at the time of the execution of the instrument, the decedent was a man of 75 years of age, with the infirmities that might well inhere to one so far advanced in life; and the two sons-in-law testified that he indulged in drink, and it is claimed that this increased the weakness of mind which it is urged was characteristic of him at the time of the execution of the will, and had been for some time previous. But the weight of evidence is that while the decedent was in the habit of drinking beer at his meals, his habits were those of a sober man. His sons-in-law testified to only two or three instances when he was intoxicated. He held a responsible position in the institution for 45 years, without a suspicion on the part of his superiors that he was not a temperate man, which could not have been the case if the fact were otherwise.

Mr. Vaughan testified further that the decedent had an attack of apoplexy in 1882. But this statement is not entitled to any consideration. It is unsupported by the testimony of other witnesses, and no symptoms are described which would indicate the existence of such a malady; and the decedent continued to pursue his daily avocations until September, 1884, with the exception of a short period about 1883, when he was disabled by rheumatism and the swelling of his limbs. To this fact I believe is to be attributed the statement that the trouble was apoplexy, and which may at the time have been mentioned in current conversation in connection with his temporary disability. It is doubtless true that a year before his death the decedent showed evidences of failing memory, manifested by beginning a conversation on a subject, and, without completing what he had to say, wandering to another. Such peculiarities are common to old age, but their existence has no significance in respect to one's soundness or unsoundness of mind without other evidence. If it were an established fact that this feature exhibited itself prior to the time of the execution of the will, it is not inconsistent with mental soundness. The concurrent testimony of alienists is that the memory is the first of the faculties to be affected in the gradual decay of the mental powers in advanced age. It may be defective in respect to passing events and in current conversation, and yet the integrity of the mind, in the transaction of business and in the disposition of property by will, be without question. The present case is an illustration. The testimony shows that the decedent was the father of four children, three of whom had died previous to the execution of the instrument in question. After the death of the first of his children, his eldest son, he stated to Mr. Crout that he desired Crout's family to have the house in One Hundred and Twenty-Sixth street, and said something about giving the other house to Mrs. Vaughan, and would like to have his affairs fixed up in Carmansville for Edward. Nothing, however, was said by the decedent to him on the subject after Mrs. Crout's death in 1882, and the matter was last spoken of in 1880 or 1881. Mr. Vaughan, the other son-in-law, testified that as early as 1878 or 1879 the decedent told him that Mrs. Crout should have

one house in Harlem and Mrs. Vaughan the other, and that the property in Carmansville should go to his son Edward. He testifies also that by the first will, which was shown him in 1881, the property was equally divided between the three surviving children, except that $500 was given to each child of the deceased son William. Mr. Whelp testifies that the second will was drafted by him, from directions given by the decedent after the death of Mrs. Crout. By it Mrs. Crout's children were made specific legatees with the children of William, each in the sum of $500, and the residue of the estate was divided equally between the surviving children, Edward and Mrs. Vaughan. In August, 1884, after the death of Mrs. Vaughan, the instrument now in contest was executed. By it the legacies to the grandchildren were increased to $600, and the children of Mrs. Vaughan were included with the others, as recipients of his bounty to that amount, and Edward was again named as residuary legatee on the termination of the life-tenancy of the widow. I am satisfied that there was a well-considered purpose in the mind of the decedent in the arrangement of the provisions of the successive instruments, in accordance with a general scheme to care primarily for his children who might be living at the time of his death, and in a lesser degree for the offspring of his deceased children; and each will is consistent with the scheme. That he well understood the provisions of the instrument in question is manifested by his antecedent and subsequent declarations. To Mr. Currier, one of the subscribing witnesses, he stated, in the summer of 1884, that he intended to give the major part of his property to Edward, as he was his only son, and that he considered such a disposition just and right, and his conversations with Mr. Currier were frequent to that purport. To his sister, Mrs. Coleman, he stated in the spring of 1884 that he was going to make a will; that he had lost his two daughters; and that he was going to give $500 or $600 (she does not recollect which) to each of his grandchildren, and the bulk of his estate to his son Edward. Subsequently, in November, 1884, when the decedent was on a visit to Mrs. Coleman's house in the country, he told her that he had made such a will, reciting the provisions in the same way, but adding that the share to Edward was to go to him after the death of his wife; and later in the same month the decedent wrote to her from New York to the same effect. The concurrent testimony of several witnesses who conversed with the decedent in 1884, 1885, 1886, and perhaps in 1887, most of whom were very intelligent and entirely without interest in the contest, is that the decedent spoke as usual on ordinary matters, and there seems to have been no suspicion in their minds, leaving out the testimony of Crout and Vaughan, (the fathers of the minors in whose behalf the contest was inaugurated,) that there was any decay in the decedent's faculties until late in 1886, when there is proof of lapses of memory and some want of coherence in conversation, not unfrequently observed in aged persons near the close of their lives.

Let a decree be handed up admitting the will to probate.